# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

JAMIE COE,

      Plaintiff,                    File No.

v.                                     Hon.

TRINITY HEALTH-MICHIGAN d/b/a
MERCY HEALTH ST. MARY'S,
MERCY HEALTH, and/or ST. MARY'S
HOSPITAL,

      Defendant.

_____

## VERIFIED COMPLAINT AND JURY DEMAND
_____

### Complaint

Plaintiff Jamie Coe, by and through his attorneys, Pinsky, Smith, Fayette &

Kennedy, LLP, brings this action under a pseudonym, and states as follows:

### Jurisdiction, Venue, and Parties

1.     This is an action requesting the Court to remedy a violation of

Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §37.2101,

*et seq.*, and breach of contract and defamation under Michigan law.

2.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §

1332(a)(2).

3.      Plaintiff Jamie Coe is a citizen of the country of Syria. He is legally

residing in the United States pursuant to a J-1 visa but is not a permanent resident

of the United States.

4.      Plaintiff has brought this action under a pseudonym because he has

legitimate fears of physical harm and threat to him and/or his family if his real

name is known.

5.      Defendant Trinity Health Michigan (d/b/a Mercy Health St. Mary's)

(hereinafter "Defendant" or "Mercy Health") is an integrated health care network

and accredited teaching hospital located in Grand Rapids, Michigan in the Western

District of Michigan.

6.      The amount of the matter in controversy exceeds the sum or value of

$75,000.

7.      Venue is proper within this judicial district under 28 U.S.C. § 1391(b).

The acts which are the subject of this action occurred in the Western District of

Michigan, Southern Division.

## Factual Allegations

8.      Plaintiff is of Syrian descent and is a trained and board-certified

medical doctor in Syria. He speaks English as a second language.

9.      In June 2018, Plaintiff was hired as a medical resident to complete a

residency program at Mercy Health.

10.     Plaintiff signed his year-one Agreement for Residency Appointment on

June 14, 2018. (Exhibit A, Year One Contract.) The residency was set to begin on

August 13, 2018. (*Id.*) Due to delays in obtaining his J-1 visa, Plaintiff was unable to begin his residency until September 2018.

11.     After successful completion of his first year as a resident, Plaintiff signed a year-two Agreement for Residency Program on April 24, 2019. (Exhibit B, Year Two Contract.) Plaintiff's second year of residency began on September 11, 2019. (*Id.*)

12.     Both contracts contain a "Grievance and Due Process Procedure." (Exhibit A, Exhibit B.) Paragraph 3.5 of the year-two contract states:

> A grievance and due process procedure is available to Resident for adjudication of (a) academic or other disciplinary actions which could result in dismissal, appointment non-renewal or other actions that could significantly threaten a resident's status … A current copy of the Graduate Medical Education ("GME") Appeal Policy is available from the GME office.

(Exhibit B, ¶3.5.)

13.     Throughout Plaintiff's residency, Defendant provided him positive reviews on his performance, including being repeatedly referred to as "excellent." Particularly because he was a fully trained physician in Syria, Plaintiff was known for being more knowledgeable and experienced than the average resident.

14.     Comments from Plaintiff's most recent review included:

- He is pleasant to work with. Overall, he is very polite and respectful.
- He does an excellent job teaching.
- [Jamie Coe] is a pleasure to have in clinic, well-liked by staff.
- Overall, [Jamie Coe] is a great asset to our residency program and has a good breadth of knowledge.

3

15.     Plaintiff's reviews also noted that "at times" he "may come off as abrasive and/or argumentative" but that it "may very well be unintentional." Likewise, it was noted that Plaintiff has a "direct communication style" and one review alleged that "at times" he is argumentative.

16.     It was likewise noted that Plaintiff "sometimes comes off as overconfident at times" but that "he has been improving his integration into the team as we have gone along."

17.     Additionally, his reviews also note that Plaintiff's communication style can be at least partially attributed to the fact that Plaintiff is a fully trained physician in Syria, and therefore he came to Defendant's residency program with more experience and expertise than other residents.

18.     Defendant never informed Plaintiff that his communication style violated the Standards of Conduct nor was he ever given any form of corrective action prior to his sudden termination on June 12, 2020, despite Defendant employing progressive discipline as its regular practice.

19.     Program residents and other employees of Defendant who have reached out to Plaintiff following his sudden termination from the residency program have all expressed shock and disbelief, as Plaintiff is well-liked and well-respected, and his colleagues have expressed that they do not believe he could be capable of doing something worthy of summary termination.

20.     On June 2, 2020, Defendant's management team told Plaintiff that he was suspended from work pending an investigation.

21.　　Defendant's management team gave Plaintiff no information regarding the scope of the investigation or of what conduct he had been accused.

22.　　Defendant's management team, in summarily suspending Plaintiff, did not instruct Plaintiff that he was banned from Defendant's property.

23.　　Plaintiff went to the hospital to see his mentors and ask for information about the investigation. When Defendant's management team learned Plaintiff was at the hospital, Dr. Johnson told Plaintiff he was banned from the property. Plaintiff left the grounds immediately upon learning this.

24.　　Following a confirmation of his departure, however, Mercy Health security personnel actively and openly searched for Plaintiff at the hospital. They directly questioned other residents and staff about Plaintiff, telling them that if they saw him, they needed to call security immediately as he was not allowed on hospital property.

25.　　These unwarranted actions by Defendant violated the supposed confidentiality of the investigation and severely damaged Plaintiff's professional reputation.

26.　　Plaintiff meanwhile still had no notice or information regarding the complaint against him and thereby no means by which to defend himself.

27.　　Without any notice of the content or even subject-matter of the complaint against him, Plaintiff participated in an in-person interview with the director of his specialty residency program, an individual from the GME program, and a representative from Human Resources.

28.     They asked Plaintiff if he knew what the issue was, and Plaintiff said that he may have an idea. Plaintiff's answer that he may have an idea was based on the actions of security personnel – which he surmised to mean he had been accused of serious misconduct – and the fact that the last shift he had worked was with a first-year female resident whom he had not seen since.

29.     Plaintiff explained he wanted to hear from them of what he had been accused, because he genuinely did not know.

30.     They answered that the female resident had accused him of an "incident" on their 5/31-6/1 shift together.

31.     Defendant's agents then asked Plaintiff about his relationship with the female resident, which was appropriate and unremarkable as the two had interacted as residents and colleagues, but never socially or outside of work.

32.     Defendant's agents then asked about the shift on 5/31/-6/1. Plaintiff explained what took place during the shift, all of which was appropriate and unremarkable.

33.     His explanation included the fact that he had helped the female resident practice an opthalmascope exam – after she requested that assistance – and that the practice involved him allowing her to examine his eyes in order to learn the appropriate technique.

34.     This type of practical teaching, including practicing on a fellow resident, was commonplace and a typical means of teaching between residents.

35.     As Plaintiff was a second-year resident, part of his job was to educate and train first-year residents.

36.     At no time during the exam did Plaintiff touch the resident inappropriately or with sexual intent, nor did he say anything with sexual or romantic intent.

37.     The interviewers then questioned Plaintiff about specific conduct – though without saying if this was the conduct of which the female resident had accused him. For example, they asked if he had touched the female resident's neck, tried to kiss her, or kiss her hand. Plaintiff denied that he had done any of those things.

38.     They then asked if Plaintiff had asked the female resident to "straddle" him while they were practicing the opthalmoscope exam. Notably, English is not Plaintiff's first language, and he did not understand the meaning of the word "straddle" and had to have the term explained to him.

39.     Once he understood, Plaintiff denied that he had ever asked the female resident anything like that.

40.     At no time during this interview did the interviewers clearly state what the female resident claimed to have happened. Plaintiff could only guess at her accusations based on those vague questions.

41.     Plaintiff consistently denied, and continues to deny, any sexual harassment or misconduct of anyone.

42.     Because he had no notice – and still lacks sufficient notice – of the allegations against him, Plaintiff was not able to fully or adequately defend himself during the interview.

43.     Following this interview, no further information was given to Plaintiff, and Defendant's agents asked no further questions. He still has no information regarding what was done to investigate the allegation, who was contacted, what those witnesses were asked and how they responded, nor what (if any) evidence was relied upon.

44.     Then, via a Zoom call on Friday June 12, 2020, Dr. John VanSchagen informed Plaintiff that Defendant had decided to terminate his employment with Mercy Health.

45.     Plaintiff was extremely shocked and asked what evidence they were using to support their decision.

46.     The Human Resources representative told him that "the documents" and interviews with him and other individuals supported their decision.

47.     Plaintiff questioned what information "other individuals" could have provided, because there were no other residents on call during the shift in question. He then repeated that he had denied – and continues to deny – any misconduct, so again he asked on what evidence they were basing their decision.

48.     The Human Resources representative then shifted her argument from a supposed evidence-based decision to a claim that Plaintiff's communication style, which some claimed to be "argumentative" or "direct," supported their decision that

8

he had violated the harassment/offensive behavior policy and supported a decision to skip progressive discipline and summarily terminate Plaintiff.

49.     When Plaintiff continued to politely advocate for himself and deny both that characterization and the logical fallacy of using it to justify a finding of harassment, Dr. VanSchagen responded by saying words to the effect that Plaintiff's protest of his termination was exactly the type of "argumentative" communication they were talking about.

50.     During the June 12, 2020 meeting, Plaintiff clearly stated that he intended to appeal the decision and he requested information on how to begin the appeal.

51.     In the termination letter, Defendant claimed that Plaintiff violated the "Harassment/Offensive Behavior Policy" and that he had a "pattern of behavior that violates the Standards of Conduct."

52.     The letter further claimed that there was a "complete and thorough investigation regarding the concerns." Plaintiff is unaware of any actions or content of that investigation aside from his own hasty interview in which he participated without any knowledge of the allegations against him.

53.     Following his termination, Plaintiff hired counsel to represent him in this matter.

54.     Counsel for Plaintiff reached out to the residency Program Director and the Human Resources representative involved in the meetings with Plaintiff and stated that Plaintiff wished to appeal his termination. Counsel also asked for

notice of the allegations against Plaintiff as well as any recordings of interviews or other "evidence" used to justify the decision to terminate Plaintiff based on this allegation.

55.    Counsel for Plaintiff also asked for clarification and policy documents related to the appeal/grievance processes available to Plaintiff, including the GME appeal in his residency agreement contract and the "Fair Treatment Review" procedure emailed to Plaintiff following his termination meeting.

56.    In response, a Human Resources representative for Defendant sent a blank "Fair Treatment Review" form but provided no further information and answered no further questions.

57.    Counsel for Plaintiff reached out to in-house counsel for Defendant and Defendant's Chief Human Resources Officer via email and telephone on multiple other occasions between June 15 and June 30, 2020, asking for clarification of the appeal process, more information about the complaint and the investigation, and to schedule a call to discuss Plaintiff's appeal and other specific matters of importance, including Plaintiff's health insurance coverage and email access.

58.    In an attempt to prepare an appeal and defense against the allegations on behalf of Plaintiff, counsel for Plaintiff attempted to contact residents and other employees of Defendant who may have information regarding the complaint, investigation, and/or Plaintiff's work performance, communication, and character. Defendant's Chief Human Resources Officer called counsel for Plaintiff and left a

voicemail message asking that she not attempt to contact any of Defendant's employees.

59.     Upon information and belief, Defendant sent at least one email message to other residents and employees instructing them not to talk about this matter to anyone, including Plaintiff or his counsel.

60.     Upon information and belief, residents and other employees of Defendant have information relevant to the allegation and investigation, as well as other information relevant to Plaintiff's defense, and they would like to provide that information to Plaintiff or his counsel but are afraid of retaliation from Defendant if they do so.

61.     On June 12, 2020, before Plaintiff had an opportunity to even inquire about the GME appeal or Fair Treatment Review process, the Program Director sent an email notifying all residents of Plaintiff's termination.

62.     Plaintiff, via his counsel, submitted a Fair Treatment Review Request and grievance/appeal under the GME procedure to Defendant on Thursday, June 18, 2020, despite having no guidance or information as to what the appeal processes supposedly entailed but in an effort not to miss any potential deadline for submitting an appeal.

63.     Shortly thereafter, Defendant removed Plaintiff's name and profile from their residency webpage.

64.     On Monday June 29, 2020, Defendant's residency Program Coordinator called Plaintiff directly and instructed him to return his laptop and

pager to the hospital. Despite Plaintiff's counsel's repeated attempts to communicate with Defendant and repeated notification that Plaintiff is represented by counsel, this communication was made directly to Plaintiff without any attempt to notify or communicate with his attorney.

65.     Finally, on July 1, 2020, counsel for Plaintiff received a message from Chief Human Resources Officer Mary Rosser stating that they had scheduled a Fair Treatment Review meeting for Plaintiff on Monday July 13, 2020. She provided no further information about the GME appeal process outlined in Plaintiff's contract.

66.     On or about July 1, 2020, counsel for Plaintiff spoke with Ms. Rosser by telephone and requested a copy of the GME appeal policy (a request counsel had made to Defendant on multiple earlier occasions).

67.     On Friday July 10, 2020, Ms. Rosser sent Plaintiff's counsel a list of "specific allegations." The "specific allegations" consisted of a six-point bullet list with phrases that included "Grabbing face multiple times," "Petting head," "Attempt to kiss and place tongue in mouth," "Kissing hand," "Attempt to rub shoulders and touching lower back," and "Request to straddle." No further information regarding the context or content of the allegations was shared, nor has Plaintiff ever received any information regarding what supposed evidence supports the allegations.

68.     Plaintiff has consistently denied, and continues to deny, engaging in any inappropriate touching or sexual misconduct toward the female resident or anyone else.

69.     Chief Nursing Officer Michelle Pena conducted an interview with Plaintiff on July 13, 2020. During the interview, she stated that she was coming to the process "cold" and that she knew nothing about what had happened.

70.     Ms. Pena asked Plaintiff to explain what had happened from the first notice he received from the program director of his residency program through his termination. She did not ask him specific questions about the allegations.

71.     She asked him what witnesses or other individuals she should speak with regarding the review.

72.     Counsel for Plaintiff stated that they still had not been given sufficient notice of the specific allegations and without knowing more about the alleged conduct for which he was terminated, he cannot adequately defend himself or offer information about evidence or witnesses.

73.     During the Fair Treatment Review meeting on July 13, 2020, counsel for Plaintiff again requested a copy of the GME appeal policy.  Counsel for Defendant finally emailed a copy of the policy on July 17, 2020.

74.     The GME policy requires that residents give written notice to a designated official of their desire to appeal the corrective action within 15 days of the corrective action. By the time Plaintiff received a copy of the policy, over 30 days had already passed.

75.     On July 20, 2020, counsel for Plaintiff emailed counsel for Defendant and asked to confirm that the multiple other messages and documents sent specifically requesting an appeal via the GME appeal policy were sufficient to

provide notice of Plaintiff's intent to appeal. Counsel also asked for the specific steps and timeline of Plaintiff's GME appeal.

76.     As of the writing of this Complaint, Plaintiff's counsel's questions have not been answered.

77.     The GME appeal policy states that the entire appeal procedure should take 60 days. Over 45 days has already passed since Plaintiff's termination.

78.     It has become clear that Defendant has no intention of fairly reviewing the decision to terminate Plaintiff either via the Fair Treatment Review or the GME appeal and that the decision to uphold the termination is already a pre-determined decision reached without the due process to which Plaintiff is entitled pursuant to his contract.

79.     Plaintiff's termination without fair notice or due process and the failure to afford Plaintiff a legitimate appeal as guaranteed in his contract has irreparably damaged Plaintiff's professional reputation and his educational goals and has put his and his family's immigration status at immediate risk.

## Count I – Violation of ELCRA – Race Discrimination

80.     Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

81.     Defendant's denial of due process, failure to provide any progressive discipline, and shifting rationale for its decision to terminate Plaintiff in response to an American woman's allegations against him demonstrate unlawful bias due to Plaintiff's ethnicity as a Syrian and as a non-American.

82.      From the limited information Plaintiff has received regarding the allegation and the "investigation," there was a credibility determination made regarding his word as a Syrian versus the word of an American, Caucasian woman. Upon information and belief, Defendant has no information or evidence regarding its apparent conclusion regarding the belief of unwanted sexual or romantic advances toward the female first-year resident, other than the statements from Plaintiff and the female resident. Without showing any legitimate reason for doing so, Defendant apparently determined that the American woman was more credible than the Syrian man, and/or that Defendant should err on the side of crediting the allegation if the credibility determinations were equal.

83.      Defendant's actions related to the termination of Plaintiff from his position as a resident resulted from unlawful discrimination on the basis of Plaintiff's ethnicity.

84.      Defendant violated the ELCRA, Mich. Comp. Laws § 37.2101, *et seq.*, when it committed the acts of discrimination on the basis of ethnicity as aforesaid.

85.      Plaintiff has suffered irreparable harm, in that he has been unlawfully discriminated against as aforesaid and will continue to suffer such harm unless the relief requested herein is granted.

## RELIEF SOUGHT

WHEREFORE, Plaintiff requests that the Court grant him the following relief:

A.      Return Plaintiff to his position as a resident at Mercy Health.

B. Order that the Defendant either delay notification of Plaintiff's wrongful termination to the Educational Commission for Foreign Medical Graduates ("ECFMG"), the international organization which sponsored Plaintiff's J-1 visa, while the instant litigation is pending or notify ECFMG that the Plaintiff has been reinstated to his position, if his termination has already been communicated;

C. Award Plaintiff damages equal to any salary, wages, bonuses, employment benefits and/or other compensation denied or lost to him by reason of violations of ELCRA by Defendant, plus interest;

D.     Award Plaintiff compensatory damages for mental anguish and emotional distress;

E.     Award Plaintiff punitive damages;

F.     Award Plaintiff his costs and reasonable attorney fees;

G.     Award Plaintiff such other relief as may be just and equitable.

## <u>Count II – Breach of Contract</u>

86.     Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

87.     Pursuant to Plaintiff's employment contract, he is entitled to due process and a GME grievance/appeal procedure upon issuance of discipline.

88.     Plaintiff entered into the employment contract, relocating his family from another country to the United States and obtaining immigration status based

upon his participation in the residency program, with the understanding that he would be afforded due process including the right to an appeal upon the issuance of any discipline.

89.     Plaintiff was not afforded adequate due process when he was interviewed by three employees of Defendant without notice or specific knowledge of the allegations made against him.

90.     Plaintiff was not afforded adequate due process when Defendant relied upon evidence which has been kept secret from Plaintiff and counsel, and without providing Plaintiff an opportunity to respond to that evidence.

91.     Plaintiff was not afforded adequate due process when Defendant decided to terminate his employment without any apparent attempt to actually investigate the allegations.

92.     Plaintiff was not afforded due process when his counsel's requests for information regarding the procedure for appeal and attempts to submit an appeal were ignored.

93.     The brief and deficient Fair Treatment Review interview in which he was again denied any information that would allow him to adequately respond to the allegations did not meet the due process provision of Plaintiff's contract.

94.     Defendant's intention to deny Plaintiff his contractual due process right to an appeal was made clear when, on the day of his termination, an email was sent to other residents notifying them of Plaintiff's termination. It was again confirmed when Plaintiff's profile was removed from Defendant's webpage before

any "appeal" was heard and when Defendant called Plaintiff and asked him to return Mercy Health property.

95.     The failure to take any action regarding the GME appeal – or even respond to counsel's request for a copy of the appeal process until over 30 days after Plaintiff's termination – is a violation of Plaintiff's employment agreement which specifically entitles him to a GME appeal.

96.     Defendant breached its contract with Plaintiff when it committed the acts as aforesaid.

97.     Plaintiff has suffered irreparable harm in that he has been unlawfully terminated without due process or the contractual appeal procedure and will continue to suffer such harm unless the relief requested herein is granted.

### RELIEF SOUGHT

WHEREFORE, Plaintiff requests that the Court grant him the following relief:

A.     Fashion equitable relief to provide Plaintiff adequate due process;

B.     Return Plaintiff to his position as a resident at Mercy Health;

C. Order that the Defendant either delay notification of Plaintiff's wrongful termination to the Educational Commission for Foreign Medical Graduates ("ECFMG"), the international organization which sponsored Plaintiff's J-1 visa, while the instant litigation is pending or notify ECFMG that the Plaintiff has been reinstated to his position, if his termination has already been communicated;

18

D. Award Plaintiff damages equal to any salary, wages, bonuses, employment benefits and/or other compensation denied or lost to him by reason of breach of contract by Defendant, plus interest;

E.     Award Plaintiff compensatory damages for mental anguish and emotional distress; and

F.     Award Plaintiff punitive damages.

## Count III – Defamation

98.     Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

99.     Defendant made a false and defamatory statement to residents and other hospital employees when its security personnel openly searched for Plaintiff and told residents and other employees that Plaintiff was not allowed on Mercy Health property and that they should call security if they see him.

100.    No investigation had yet been conducted regarding the allegations against Plaintiff, and security's statements to hospital employees falsely asserted that Plaintiff was dangerous or unlawful or had been found guilty of some severe misconduct.

101.    These false statements caused special harm to Plaintiff as they were made to his colleagues in his place of employment, thereby irreparably damaging his profession reputation and future professional opportunities.

102.    Defendant defamed Plaintiff when it committed the acts as aforesaid.

19

103.    Plaintiff has suffered irreparable harm in that he has been unlawfully defamed in his place of employment and among colleagues whose professional opinion of him matters significantly.

## RELIEF SOUGHT

WHEREFORE, Plaintiff requests that the Court grant him the following relief:

A.    Return Plaintiff to his position as a resident at Mercy Health.

B.    Award Plaintiff damages equal to any salary, wages, bonuses, employment benefits and/or other compensation denied or lost to him by reason of defamation by Defendant, plus interest;

C.    Award Plaintiff compensatory damages for mental anguish and emotional distress;

D.    Award Plaintiff punitive damages.

Award Plaintiff PINSKY, SMITH, FAYETTE
& KENNEDY, LLP
Attorneys for Plaintiff


Dated: August 3, 2020                By:  /s/ Sarah Riley Howard

Sarah Riley Howard
Erin L. Dornbos
Business Address:
146 Monroe Center, N.W., Suite 805
Grand Rapids, MI 49503
(616) 451-8496

## JURY DEMAND

To the extent that jury trial is available as to any of the issues set forth

above, Plaintiff hereby demands same.

PINSKY, SMITH, FAYETTE & KENNEDY, LLP
Attorneys for Plaintiff

Dated: August 3, 2020      By: ___/s/ Sarah Riley Howard_____
                                   Sarah Riley Howard
                        Erin L. Dornbos
                        Business Address and Telephone Number:
                        146 Monroe Center St NW, Suite 805
                        Grand Rapids, MI 49503
                        (616) 451-8496

## <u>VERIFICATION</u>

I am the Plaintiff this action. I have carefully reviewed the factual assertions. All factual assertions contained in the Complaint are true to the best of my knowledge, information, and belief.

Jamie Coe
_____
Jamie Coe

(This is a pseudonym. A Verification with my actual signature is on file with my attorneys.)